## TURNER *v.* STATE.

### (*Jackson.*  April Term, 1913.)

**JURY.  Competency.  Opinion concerning the law.  "Good and lawful man."**

In a prosecution for the sale of intoxicating liquor outside a city within four miles of a school, a venireman who stated that he was in favor of enforcing the law outside of the city, but though saloons should be permitted to run in the city, was not qualified as a "good and lawful man" to sit upon the jury, within the meaning of the law governing the selection of juries, as found in Shannon's Code, secs. 5801, 5804, 5810, 5818, since he believes in partiality in the enforcement of the laws. (*Post, p.* 34.)

Cases cited and approved:  Fletcher v. State, 25 Tenn., 249; Ray v. State, 108 Tenn., 282.

---

### FROM SHELBY.

---

Appeal from Criminal Court, Shelby County.—JESSE EDGINTON, Judge.

ALBERT BENHAM, for appellant.

WALTER W. FAW, Assistant Attorney-General, for the State.

Mr. Chief Justice NEIL delivered the opinion of the Court.

The plaintiff in error was indicted, tried, and convicted in the criminal court of Shelby county on a charge of selling intoxicating liquors as a beverage

within four miles of a schoolhouse, where school was
kept, contrary to the statute in such cases made and
provided, and has appealed to this court and assigned
numerous errors, only one of which, however, we need
notice.

The bill of exceptions recites that, after plaintiff in
error's peremptory challenges had been exhausted, one
Sullivan was examined on his *voir dire,* and testified,
when examined by the attorney for the State, that he
would give the defendant, now plaintiff in error, a fair
and impartial trial. He was then turned over to
the attorney for the defense. The bill of exceptions
proceeds: "The attorney for the defendant, among
other things, asked the venireman if he was in favor of
enforcing the four-mile law, whereupon the venireman
said that he did not know whether he was in favor of
enforcing it or not. The defendant's attorney further
asked him if he was in favor of letting the saloons run
in town, and punishing those out of town. The venire-
man said that he did not think they ought to have any
prohibition law in Memphis. Whereupon the defend-
ant's counsel asked him if he was in favor of enforcing
the prohibition law outside of Memphis, in the suburbs,
and the venireman said he was. Whereupon the de-
fendant's counsel said: 'You are in favor of the law
applying outside of Memphis, but not applying in
Memphis?' And the venireman said he thought saloons
should be permitted to run in Memphis. Whereupon
defendant's counsel excepted, and objected to placing
the said venireman on the jury, because said venire-

Turner v. State.

man was in favor of the law applying outside of the city limits, but not inside the city limits of Memphis. The court then further interrogated the venireman, and asked him if he would bring in a verdict according to the law and the evidence, and if he could give the defendant a fair and impartial trial.'' To the last interrogatory Sullivan made no response. Plaintiff in error, through his attorney, objected to the juror; but his objection was overruled by the court, and the juror was permitted to take his seat in the box. Plaintiff in error reserved an exception, and has assigned error thereon in this court.

It is conceded on the record that Turner's place lies within Shelby county, but outside of the limits of the city of Memphis; and the matter was so treated in the oral argument at the bar by the respective counsel.

The question to be determined is whether the juror was competent. This must be settled in accordance with the following principles:.

Our forms of impanelment, both of grand and petit jurors, recite that the jurors are ''good and lawful men.'' This is no unmeaning phrase. It comes down to us from remote times, as far back as the statute of 3 Hen. VIII, ch. 12. That statute in terms applied to grand juries, but was also construed to cover the case of trial juries as well. 2 Halst. Hist. P. C., 156, 265; 5 Bac. Abridg., 313. It has also been recognized and repeated in our statutes and decisions. Shan. Code, sec. 5804; *Neely* v. *State,* 4 Baxt., 180; *Knights of Pythias* v. *Steele,* 107 Tenn. (23 Pick.), 1 and 14, 63 S. W., 1126;

*Gribble* v. *Wilson,* 101 Tenn., 612, 49 S. W., 736. At
the common law the phrase was *"liberi et legales
homines."* The word *"liberi"* in strictness imported
freeholders; but it was said: *"Liber homo* is not only
one who hath freehold land, but that hath freedom of
mind, and stands indifferent, no more inclining to the
one than the other." 5 Bac. Abridg., 348. Again:
"According to the rule expressed in the English of
those days: 'He ne es othes worthe that es enes gylty
of oth broken.' Bracton, lib. iv, tr. 1. ch. 19." The
same thought is expressed in our statutes, in the de-
scription of jurors, as men "esteemed in the com-
munity for their integrity, fair character, and sound
judgment." Shan. Code, sec. 5801. Such only are to
be appointed for service in court, and so great is the
solicitude which the law feels on this subject that it is
further provided that in case the authority vested with
the power of appointment shall fail to make the ap-
pointment, or those nominated fail to attend, "the
court shall designate *other good and lawful men,* and
direct the sheriff to summon them as jurors" (section
5804), and that the sheriff in summoning such jurors
shall be guided by the same principles (section 5810);
and to make even more fully secure the high character
of the jury, when finally constituted as a tribunal for
the trial of rights, it is provided that the judge pre-
siding may discharge from service any juror who does
not possess the requisite qualifications, and may .dis-
charge him "for any other reasonable or proper

cause'' (section 5818). The juror should be as impartial as the judge himself.

These are the requirements of the common law, as well as of our modern statutes and decisions, and by our constitution the duty is imposed on this court, and upon all of the judges of the State, to see to it that trial by jury shall remain inviolate (Const., art. 1, sec. 6), and that men shall be tried by impartial juries (Id., art. 1, sec. 9). It has been often held that the constitution means that the right of trial by jury shall be maintained in its integrity and purity as at common law. We have seen what the common law requires; also that our statutes and decisions require the same.

Now is a man who made on his *voir dire* answers such as Sullivan made a ''good and lawful man,'' an impartial man, and a good citizen? We say, ''No.'' He believes, according to his replies, that as to the special crime charged in the indictment the law should be enforced in Shelby county outside of Memphis, but not in Memphis, which is saying, in other words, that he believes in an unequal and partial enforcement of the law, favoring one portion of the people of his county, and discriminating against another portion. Such a man has not the qualification of impartiality which the common law and our statutes demand, and is not competent to sit on a case involving the crime as to which he confesses such principles of conduct.

The subject is illustrated by two concrete cases as follows:

In *Fletcher* v. *State*, 6 Humph., 249, it appeared that the plaintiff in error had been indicted in the circuit court of Jackson county, and convicted, on a charge of passing counterfeited coin, and had appealed to this court. "It is objected to the proceedings in the circuit court," said Mr. Justice Reese, "that the judge presiding at the trial, permitted the attorney-general to inquire of persons returned to serve upon the jury, when examined before the court touching their legal competency, whether they had ever taken a voluntary oath to favor counterfeiters, if at any time they might happen to be placed on the jury in the trial of persons charged with that offense. It is argued that such an inquiry is not so much calculated to prejudice the minds of those interrogated against the party interrogating, in this instance the State, as to place the jury selected in an attitude to fear the pressure of public sentiment against them, in the event they should acquit the prisoner. The interrogatory certainly is unusual and extraordinary, and one which the persons interrogated might well decline to answer. But the condition of the community, at some period and in some places, may be so peculiar that it might be dangerous to limit to a prescribed formula the interrogatories to be propounded on either side, in this preliminary trial, as to the competence of jurors. The combination might be the opposite of that imputed in this instance, and it might be important to a person to inquire into pledges and obligations of a contrary character. It will always be the business and duty of the presiding judge to re-

strain, and of that responsible officer of the government, the attorney-general, to abstain from, a course of interrogation on such occasions useless and wanton. We feel bound to presume that they did so on the present occasion, and that the course adopted was not uncalled for and was taken for the fair and honest purpose of getting a jury *omni exceptione majores.*"

In *Ray* v. *State,* 108 Tenn., 282, 67 S. W., 553, a capital case, it was held that it was proper for the attorney-general to ask one offered as a juror: "Have you any conscientious or religious scruples against capital punishment?  Have you any religious or conscientious scruples against hanging a man for murder in the first degree, when the proof shows him guilty?" The opinion of the court, delivered by Mr. Justice McAlister, proceeds:

"One juror replied that he had such scruples, and when he said, 'I don't believe in hanging,' the attorney-general asked him, 'But if the law inflicts that penalty as punishment for such offense, do you believe in it, or is the law wrong?'  The juror answered: 'The law is wrong; I don't believe in hanging.'

"The attorney-general offered to challenge the juror for this cause, which challenge was overruled by the court, and thereupon the attorney-general challenged the juror peremptorily.  It is insisted that this practice on the part of the court was erroneous and highly prejudicial to the rights of the defendant, since three jurors had already been selected and were then in the box, and were necessarily prejudiced by the assump-

tion on the part of the attorney-general that the defendant was guilty.

"We think there was no error in this action of the court. It has frequently occurred in *nisi prius* trials that jurors otherwise competent have been unwilling to execute the law, upon a finding of murder in the first degree, on account of conscientious or religious scruples against capital punishment. Mistrials have frequently resulted on this account, thus entailing unnecessary cost and consumption of the public time. The examination of the juror on his *voir dire* would discover this objection and obviate an expensive and fruitless trial."

In the first of these cases no one can doubt that an affirmative answer by a proposed juror to the inquiry propounded would have discovered his incompetency to sit in the trial of the case. So in the second instance the answer of the venireman disclosed his incompetency to sit as a juror on the trial of a capital case. In neither instance could the juror be considered impartial, or a "lawful," or law-abiding, man.

So, in the present instance, we think, on the grounds we have stated, that the venireman Sullivan was not competent to sit as a juror in a case of the kind we have before us. The judgment will therefore be reversed, and a new trial awarded.